68 F.3d 462
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eric MCLEAN, Defendant-Appellant.
 No. 94-5337.
 United States Court of Appeals, Fourth Circuit.
 Argued: July 14, 1995.
Decided: October 11, 1995.
 
 ARGUED: Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, MD, for Appellant. Joseph Lee Evans, Assistant United States Attorney, Baltimore, MD, for Appellee. ON BRIEF: James K. Bredar, Federal Public Defender, Baltimore, MD, for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, MD, for Appellee.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Defendant Eric McLean appeals his convictions of conspiracy to use unauthorized access devices and attempted use of unauthorized access devices on the ground that the evidence was insufficient to support the verdicts. We affirm.
 
 I.
 
 2
 Eric McLean was indicted on July 22, 1993 along with Victor McKoy (a/k/a Shawn Tango and Robert Adler), Arthur S. Greenfield (a/k/a Arthur Fox), and Paul Madu for conspiracy to use unauthorized access devices (count 1), in violation of 18 U.S.C. Sec. 1029(b)(2), and five counts of attempted use of unauthorized access devices (counts 2-6), in violation of 18 U.S.C. Secs. 2, 1029(b)(1). Julie Hightman, an unindicted co-conspirator, testified against McLean at trial. Greenfield and Madu also testified as government witnesses at trial as part of separate plea agreements. On January 12, 1994, the jury found McLean guilty on all six counts of the indictment, and this appeal followed.
 
 
 3
 Victor McKoy was the ringleader in a conspiracy to buy computers with stolen credit card numbers in order to resell the computers. McKoy recruited Miss Hightman, Greenfield, Madu, and McLean to participate in the conspiracy.
 
 
 4
 During January 1993, McKoy would have Miss Hightman call Greenfield, who worked as a bill collector at the time, and give him a name, address, and zip code that she had picked out of the telephone book. Greenfield would then give her that person's credit card number, the credit limit, the balance on the card, and the name of the bank that issued the card. Miss Hightman, pretending to be a secretary at Ramey Real Estate, a fictitious company, called various computer stores to inquire about prices. Capital Computer Wholesalers (Capital Computers) offered a low price, and McKoy decided to obtain the computers from them. Apparently the low price was taken so more computers could be fraudulently obtained within the credit card limits.
 
 
 5
 Miss Hightman told the president of Capital Computers, Christopher Leigh, that Ramey Real Estate employees planned to pay for the computers with their personal credit card accounts and then take the expense as business deductions on their tax returns, but because the employees were not all in the area, she would have to supply him with the account information over the telephone. Leigh agreed to that procedure once the credit card company through which Capital Computers did its transactions stated that it was possible to complete the sale without an imprint of the credit card. Once Leigh had the account information, Capital Computers' credit card company attempted to verify with the cardholders that the purchases were authorized. The credit card company discovered that the charges were not authorized, and Leigh called the D.C. police, the Montgomery County police, and finally, the Secret Service.
 
 
 6
 Meanwhile, McKoy arranged for Madu to pick up eleven computers from Capital Computers on February 1, 1993 and bring them to McKoy's apartment. McKoy and Madu unloaded three of the computers at McKoy's apartment, but left eight computers in the truck. McKoy then said he needed to talk to his cousin Eric McLean. Madu and McKoy drove to McLean's house, and McKoy went into the house. McLean was not home at the time, but when McLean returned, he and McKoy talked inside the house while Madu and the computers waited outside. McLean's role in the conspiracy was to sell the computers. In fact, McLean had already given McKoy $10,000 in cash, which he had received from buyers.
 
 
 7
 Capital Computers, by that time in league with the Secret Service, had not given Madu eleven working computers. The company gave Madu eleven monitors, eleven keyboards, and eleven computer cases without internal parts. When McKoy later discovered that the computers needed to be exchanged, McLean drove the truck with the eight computers in it to Madu's house and gave Madu a few dollars for gas. On February 5, Madu had to first pick up the three computers from McKoy's house in order to exchange all eleven computers, so he paged McLean and McLean brought him more money for gas. Once Madu made the exchange, he was supposed to page either McLean or McKoy. Before Madu could contact either of them, however, Secret Service agents stopped him.
 
 
 8
 The agents had Madu beep McLean's pager periodically, but McLean did not respond. The agents then had Madu drive to McKoy's apartment to deliver the computers and to attempt to contact McKoy. Madu, on the telephone to McKoy, attempted to act as if nothing had gone wrong, but finally confirmed McKoy's suspicions that he had been caught by the police.
 
 
 9
 McKoy telephoned Miss Hightman to warn her that Madu had been arrested. McKoy told her to page McLean on his beeper and warn him to stay away from McKoy's apartment. At one point during this conversation, McKoy referred to a telephone conversation Miss Hightman had with Leigh at Capital Computers by asking if Leigh "sound[ed] the same." She reassured McKoy that Leigh sounded "perfectly fine" when she spoke with him. At trial, Miss Hightman explained that she meant that Leigh did not sound suspicious, as if he had "found out about the cards."
 
 
 10
 When McLean finally called Miss Hightman, she was still on the telephone with McKoy, but she talked with McLean and McKoy through her call waiting feature. She told McLean not to go near the apartment and he said he knew that. Miss Hightman alternated talking with McLean and McKoy, but McKoy told her not to stay on the phone with McLean too long because she was not supposed to know anything about McLean. By this point, McLean had hung up. McLean called Miss Hightman back later to tell her to change the code that she used when she beeped him, but he also asked Miss Hightman what happened when she called the computer store. Specifically, he asked whether the person at the store just said that "everything was alright." She reassured McLean that everything was fine with the computer store. McLean ended the call after telling Miss Hightman to let him know if she heard anything.
 
 II.
 
 11
 The defendant argues on appeal that the government did not set forth substantial evidence at trial to support the convictions. When the defendant challenges the sufficiency of the evidence, we must construe the evidence in the light most favorable to the government and sustain the jury's verdict if there is substantial evidence to support the verdict. Glasser v. United States, 315 U.S. 60, 80 (1942). A conspiracy may be proved by circumstantial evidence, United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991), and may be inferred from the totality of circumstances shown by the government. United States v. Harris, 39 F.3d 1262, 1267 (4th Cir.1994); see United States v. Mabry, 953 F.2d 127, 130 (4th Cir.1991), cert. denied, 504 U.S. 914 (1992).
 
 III.
 
 12
 In this case, there was substantial evidence to support the jury verdict. McLean contends that he was unaware of the use of unauthorized credit cards to acquire the computers. The jury could reasonably infer the opposite, however, from the evidence the government presented.
 
 
 13
 Miss Hightman testified that McLean would not talk to Victor McKoy in front of her. She stated that McKoy and McLean would talk together privately and exclude her from the conversation during the month of January 1993. She also testified that McLean was not supposed to know that she was involved with the plan because McLean was involved and McLean had told McKoy that he did not trust her. When McLean called Miss Hightman after Madu had been arrested, McKoy warned Miss Hightman not to spend too much time on the phone with McLean because she was not supposed to know anything about him.
 
 
 14
 Madu testified that McLean and McKoy talked immediately after McKoy had possession of the computers. When McKoy later discovered that the computers needed to be exchanged, it was McLean who drove the truck with the eight computers in it to Madu's house so Madu could exchange the computers, and it was McLean who gave Madu gas money. When Madu needed more gas, he paged McLean and McLean brought him more money. Once Madu exchanged the computers, he was supposed to page either McLean or McKoy.
 
 
 15
 According to Madu's testimony at trial, McKoy had told Madu about the current plan and about prior schemes in which McKoy had used stolen credit cards or credit card numbers to purchase items. Madu was someone that McKoy had only recently met, yet Madu knew the details of the plan. McLean and McKoy were close friends, if not cousins; McKoy was in McLean's house before McLean even arrived home. When McKoy learned that Madu had been arrested, he expressed concern for McLean's safety; he repeatedly told Miss Hightman to page McLean and keep him away from the apartment.
 
 
 16
 When McLean finally responded to Miss Hightman's pages, he first beeped McKoy and put in only half of his phone number. McKoy told Miss Hightman that McLean had beeped him and said that McLean was "probably scared to call." Miss Hightman testified that one would put in only half of a phone number if one thinks the person he is beeping is in trouble and he does not want the police to have his number.
 
 
 17
 When McLean called Miss Hightman he asked her what happened when she called the computer store, specifically did the salesman just say "everything was alright." Miss Hightman reassured McLean that everything was fine with the computer store. She testified that this question from McLean signalled to her that he knew about the plan and about her involvement in the plan and that he wanted to know if the computer store president was suspicious. If McLean thought, as he argues he did, that the computers were simply being exchanged, then he would not have had reason to inquire into the suspicions of the computer store president. The jury could reasonably infer from McLean's question that McLean knew about the fraudulent computer purchases.
 
 
 18
 Based on the evidence of conversations between McLean and McKoy, McLean's involvement with the exchange of the computers, the close relationship between McLean and McKoy, and McLean's conversations with Miss Hightman, the jury could reasonably infer that McLean knew the substance of the plan, and that the computers were purchased by the use of the fraudulent credit card scheme.
 
 
 19
 We are of opinion that substantial evidence supports the jury's verdict on the conspiracy count. Because the jury found McLean guilty of conspiracy to use unauthorized access devices, he is liable for all foreseeable acts of his co-conspirators committed in furtherance of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 646-48 (1946). Therefore, we also uphold the jury's verdict that McLean is guilty of the substantive offenses of attempted use of an unauthorized access device. Indeed the only exception taken to the guilty verdict on the substantive counts is the claimed failure of the government "to prove Mr. McC lean's specific knowledge of a credit card scheme or his intent to facilitate such a scheme ..."*
 
 The convictions are accordingly
 
 20
 AFFIRMED.
 
 
 
 *
 With respect to the substantive counts, the jury was charged without objection that "... any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of the conspiracy may be considered against Mr. McLean."